## WRAY vs. WRAY.

1. Adultery committed by the wife when insane is no ground for a divorce on the application of the husband.

ERROR to the Chancery Court of Montgomery. Tried before the Hon. J. W. Lesesne.

THIS was a bill for a divorce by Albert G. Wray against his wife, Susan M. Wray, on the ground of adultery. The defendant in her answer denies the adultery. She also states that in 1843 she was afflicted with mental derangement, and was totally unconscious, for a period of six months or more, of everything that transpired around her; that since that time she has had frequent attacks of the same malady, and has in fact enjoyed but few lucid intervals; and that while suffering under this derangement she is entirely unconscious, as in the first attack, of everything that transpires.

The adultery is conclusively established by the testimony of several witnesses. A number of physicians were examined as to the mental condition of the defendant, and their evidence is somewhat conflicting. The seven physicians who were examined on the part of the defendant state their belief that she was deranged during the period when the adultery was proved to have been committed, but they differ as to the precise character and nature of the derangement. Three physicians testify in behalf of the complainant that they saw no evidences of insanity in the defendant, when occasionally visiting her professionally.

The chancellor held that the insanity was completely established by the evidence, and that it constituted a good defence. The bill was dismissed, and the complainant is now the plaintiff in error.

BELSER & HARRIS, and ELMORE & YANCEY, for the plaintiff:

1. As to the evidence sufficient to establish the adultery—see 2 Greenl. on Ev. 40, §§ 39, 40; Shelford on Mar. & Div. 220-21, (31 Law Library;) Poynter on Mar. & Div., (11 Law Library, 66-7.)

2. If the defendant was insane at the time of committing the adultery, her insanity was not of such a character as to prevent

Wray v. Wray.

her from distinguishing between right and wrong; and if she was capable of distinguishing between right and wrong, she is responsible for the consequences of her acts, and her insanity cannot protect her.—Roscoe on Crim. Ev., 949; McAllister v. The State, 17 Ala. 437.

3. Her insanity is no bar to a divorce at the suit of complainant.—Matchin v. Matchin, 6 Barr's (Penn.) 332.

MAYS, *contra :*

1. The adultery is not established by such evidence as will justify a decree for a divorce.—4 Por. 467; 4 Ecc. R. 415.

2. The insanity is proved beyond all doubt, and it is a complete bar to the relief sought. An insane person cannot commit adultery, or any other crime. There is no difference between the case at bar and a case where rape is committed on a married woman, or access is had to her by means of opium or some other soporific drug. All the arguments that apply to one case apply equally to the others.—7 Mass. 474.

PARSONS, J.—The time of the defendant's adultery with Prime commenced, according to the evidence, in July, 1848, and continued for several months. The question of fact is, was she insane during the whole of that time? There is so much evidence relative to this question, that a review of it is impossible within the limits of an opinion of the usual length. I shall consequently forbear comments upon the evidence in detail. Her case was certainly not one of monomania. But the difficulty of the question of fact has been increased by the various other diseases of body and mind under which she labored, at different times, during a period commencing some years before the time in question and continuing until afterwards, and probably to the present time. These diseases were puerperal insanity, hysteria and moral insanity. It is not necessary to determine whether or not her defence could be placed upon any or all of these, but as they afflicted her before the time in question, they are evidence conducing, with the other evidence in the cause, to prove that the state of insanity had ensued previous to the time to which the evidence of her adultery applies. After a full view of all the evidence, conflicting as it is, we are satisfied that the state of insanity, such as is manifested by the sufferer's delu-

sion or hallucination, had ensued before the time in question, and we are not satisfied that she enjoyed a lucid interval at any time afterwards. On the contrary, there is conclusive evidence of her insanity shortly after the time in question, and it probably continues to this time. We have carefully considered the evidence of her condition before and during the time in question and afterwards. Where clear and decisive insanity has been established at a prior time, acts of a doubtful character are of more force in proof of its existence at the time in question; and even subsequent decidedly insane acts may reflect back on acts otherwise equivocal.—Wheeler & Batsford v. Alderson, 3 Hag. 574. In her case there is evidence of insanity, as contradistinguished from puerperal insanity, hysteria, moral insanity and nymphomania, before and during the time which is material and afterwards. Several of the physicians call it a case of moral insanity. To us, however, it appears from a careful examination of every part of the evidence, that delusion belonged to it, and this we think was the opinion of the physicians, although not expressly stated. There is evidence of nymphomania subsequent to the time in question, but it was not necessary to mention that, for we do not place her defence upon it. The plaintiff's counsel relies upon her letters to Prime as containing intrinsic evidence that her mind was sound. With respect to her design, they show considerable consistency and continuity of thought, it is true. But in other respects they afford, to my mind, strong evidence of delusion. As to her consistency of thought in reference to her design, it should not be overrated. It was well observed by Sir John Nicholl, that "few madmen are so mad as to be incapable of some degree of self-control; and the cunning which madmen are often found to exercise, if bent upon carrying some favorite point, is a circumstance of the malady too well known to require any specific illustration."— Dew v. Clark, 3 Add. 79. Cases are mentioned by Lord Mansfield and by Lord Erskine which strongly illustrate the truth of Sir John's observation, but it is unnecessary to repeat them here, as the observation is generally known to be true.

2. Taking, as we do, the insanity as established, the question of law arises, whether the complainant is entitled to a decree for a divorce notwithstanding. A really insane person is criminally liable for no act whatever. The law as stated by Lord Lynd-

Wray v. Wray.

hurst, in a homicide case which was before him, is, "that the jury must believe, before they can acquit the prisoner on the ground of insanity, that he did not know when he committed the act, what the effect of it, if fatal, would be, with reference to the crime of murder.   The question was, did he know that he was committing an offence against the laws of God and nature."— Rex v. Offord, 5 C. & P. 168.   It is, however, true, as testified in this cause by one of the physicians of the lunatic asylum in South Carolina, that almost every insane person knows the difference, in the abstract, between right and wrong.   In this respect they differ from idiots.   But it does not follow that they are capable of acting on or of applying abstract principles to their own conduct.   They may not be conscious of violating any law under the imagined circumstances or obligations of duty in which they are placed.   They generally reason wrong by supposing facts or obligations of duty which have no real existence.

Had Mrs. Wray been indicted for the adultery, an acquittal would have been inevitable.   But it must be conceded that an insane person is civilly liable for his trespasses.   I do not doubt that.   It is but just that the person whose misfortune has caused an injury to another should bear the loss; and, in the next place, the *quo animo* in such cases is immaterial.   It was held in Massachusetts, that a husband was not entitled to a divorce on the ground that his wife had committed adultery when insane.—7 Mass. 474.   But it was held in Pennsylvania, that the wife's insanity at the time of her adultery was no bar to the husband's libel for a divorce.—6 Barr's R. 332.   I cannot assent to the latter opinion, although it was delivered by Chief-Justice Gibson.   It is very true, that a legitimate off-spring is one great object of marriage, and that if a sane woman act so as to disappoint her husband's object and expectations in this respect, he is entitled to a divorce.   In such case she is responsible for her acts and must abide their consequences.   If the reasoning of Mr. Chief-Justice Gibson had stopped there, no one could object to it.   But if we extend the principle upon which his opinion is chiefly founded to its necessary results, it will be found to be untenable, I think.   It would entitle the husband to a divorce, if the wife should become unfruitful from disease, or if another man should gain access to her by force or fraud.   In this case advantage was taken of her mental alienation, which can be the

cause of no forfeiture of her rights, any more than if a similar advantage had been taken by means of a soporific or of actual force.

As insanity itself is no cause for a divorce, nothing which is a consequence of it can be. The chancellor's decree is affirmed.